F I L E D

NOV 2 0 2023

Judge Sharon Johnson Coleman
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | No. 23 CR 197 |
| --- | --- |
| v. | Judge Sharon Johnson Coleman |
| JAIME SANDOVAL | |

## PLEA AGREEMENT

1.     This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, MORRIS PASQUAL, and defendant JAIME SANDOVAL, and his attorney, DANIEL RADAKOVICH, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.     The indictment in this case charges defendant with unlawful transfer of a machinegun, in violation of Title 18, United States Code, Section 922(o).

3.     Defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crime with which he has been charged.

### Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the indictment, which charges defendant with unlawful transfer of a machinegun, in violation of Title 18, United States Code, Section 922(o).

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charge contained in the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3:

On or about January 5, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, defendant JAIME SANDOVAL did knowingly transfer a machinegun, as defined in Title 26, United States Code, Section 5845(b), namely three Glock Conversion Devices, a part designed solely and exclusively for use in converting a weapon into a machinegun, in violation of Title 18, United States Code, Section 922(o).

Specifically, between December 12, 2023, and January 5, 2023, SANDOVAL was communicating via text message with an individual who, unbeknownst to SANDOVAL, was a confidential source working with law enforcement ("CS-1"). When CS-1 asked about purchasing "switches" from SANDOVAL, SANDOVAL offered to sell switches to CS-1 for $125 each.

On January 5, 2023, SANDOVAL met with CS-1 and another individual, who, unbeknownst to SANDOVAL, was an undercover law enforcement agent ("UC-1"), in an undercover vehicle in Chicago, Illinois. While SANDOVAL was in the undercover vehicle, he retrieved a firearm from his waistband, showed CS-1 and UC-1 the 3D-printed Glock conversion device installed on his firearm, and explained how to install

2

the device onto a firearm. SANDOVAL then handed three, 3D-printed Glock conversion devices to UC-1. In exchange, UC-1 handed SANDOVAL $350. UC-1 asked if the three, 3D-printed Glock conversion devices were the same as the one SANDOVAL had just shown CS-1 and UC-1 on his own firearm, and SANDOVAL responded, "Yea, it's the same ones."

SANDOVAL knew at the time he transferred them on January 5, 2023, that the "switches" he sold to CS-1 and UC-1 convert semiautomatic firearms into fully automatic firearms. SANDOVAL acknowledges that these "switches" are Glock conversion devices, or machinegun conversion devices, as defined in Title 26, United States Code, Section 5845(b), in that they are parts designed solely and exclusively for use in converting a weapon into a machinegun that shoots automatically more than one shot, without manual reloading, by a single function of the trigger.

In addition to the sale of the Glock conversion devices described above, over four other occasions between November 10, 2022, and January 24, 2023, SANDOVAL sold a total of five firearms and six other machinegun conversion devices to CS-1 and UC-1.

On November 8, 2022, SANDOVAL sent a video of three firearms, including an orange and black, AR-style pistol, to CS-1. SANDOVAL and CS-1 then coordinated a meeting via text message for CS-1 to purchase a firearm from SANDOVAL. On November 10, 2022, CS-1 met SANDOVAL in Chicago, Illinois. When SANDOVAL drove up in a car, CS-1 sat in the front passenger seat. While CS-1 was in

SANDOVAL's car, SANDOVAL gave CS-1 the firearm depicted in the video CS-1 received from SANDOVAL on November 8, 2022; that is, an orange and black, privately made, AR-style pistol loaded with sixteen rounds of .223 caliber ammunition. In exchange, CS-1 gave SANDOVAL $940.

Between approximately November 18, 2022, and November 25, 2022, SANDOVAL contacted CS-1 and exchanged text messages and a video with CS-1 about an additional firearm purchase. On November 28, 2022, CS-1 drove to meet SANDOVAL in Chicago, Illinois. SANDOVAL explained that he needed to pick up the firearm from his "cousin," and asked CS-1 to follow him in his car to a nearby alley. SANDOVAL's cousin arrived in a third car and entered a house bordering the alley. Meanwhile, CS-1 went to sit in SANDOVAL's car. A short time later, SANDOVAL's cousin exited the house, approached SANDOVAL at his driver's window, and handed him a bag containing a privately made, AR-style pistol. SANDOVAL handed the bag containing the firearm to CS-1, and CS-1 provided SANDOVAL with $900 in exchange.

Between approximately December 4, 2022, and December 6, 2022, SANDOVAL and CS-1 exchanged text messages to set up another firearm purchase. On December 6, 2022, SANDOVAL met with CS-1 and UC-1 in Indiana. SANDOVAL provided CS-1 a black, privately made, 9mm, semiautomatic pistol incorporating a Glock-type slide, which contained a loaded magazine. SANDOVAL gave CS-1 an additional unloaded pistol magazine. SANDOVAL also gave UC-1 a white, privately

4

made, .223 caliber, semiautomatic, AR-style pistol with a Hoffman Tactical 3D-printed lower receiver and a loaded rifle magazine.

In exchange for these firearms, UC-1 provided SANDOVAL $900, and CS-1 provided SANDOVAL $750, for a total of $1,650. UC-1 also gave SANDOVAL an extra $50 for traveling from Chicago, Illinois, to Indiana.

Between approximately January 14, 2023, and January 24, 2023, SANDOVAL communicated with UC-1 via text message and phone call to arrange another firearm purchase. On January 24, 2023, UC-1 met SANDOVAL in Chicago, Illinois. SANDOVAL drove to the meeting location in a car, exited the car holding a gray towel, and sat in the front passenger seat of UC-1's undercover vehicle. In the undercover vehicle, SANDOVAL unwrapped the towel from a Zastava Model M70, 7.62-millimeter rifle, bearing serial number N-PAP047444, and gave the rifle to UC-1. SANDOVAL then walked back to the car he arrived in, and returned to UC-1 with a clear plastic bag containing six machinegun conversion devices and eight replacement auto sear blades. In exchange for these items, UC-1 paid SANDOVAL $2,000. SANDOVAL acknowledges that auto sear blades are parts attached to machinegun conversion devices that allow them to fire fully automatically.

## Maximum Statutory Penalties

7.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

5

a.     A maximum sentence of 10 years' imprisonment. This offense also carries a maximum fine of $250,000. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

8.     Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the 2021 Guidelines Manual.

b. **Offense Level Calculations.**

i. The base offense level is 18, pursuant to Guideline § 2K2.1(a)(5), because the offense involved a firearm described in 26 U.S.C. § 5845(a).

ii. Pursuant to Guideline § 2K2.1(b)(1)(A), the base offense level is increased by two levels, because the offense involved between three and seven firearms.

iii. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

iv.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.      **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 1 and defendant's criminal history category is I:

i.      On or about October 4, 2021, defendant was convicted of burglary in the Circuit Court of Cook County, Illinois, and sentenced to two years of second chance probation. Pursuant to Guideline § 4A1.1(c), defendant receives one criminal history point for this sentence.

d.      **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 17 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 24 to 30 months' imprisonment, in addition to any supervised release and fine the Court may impose.

e. Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

10. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

**Agreements Relating to Sentencing**

11.   Each party is free to recommend whatever sentence it deems appropriate.

12.   It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.   The parties further agree, pursuant to Title 18, United States Code, Section 3583(d), that the sentence to be imposed by the Court shall include, as a condition of any term of supervised release or probation imposed in this case, a requirement that defendant repay the United States $5,890 as compensation for government funds that defendant received during the investigation of the case.

14.   Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

15.   This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 23 CR 197.

16. This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

17. Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

a. **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove

11

prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.     **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

18.     Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Presentence Investigation Report/Post-Sentence Supervision

19.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

20. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

21. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

22.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

23.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

24.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

25.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant,

any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

26. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

27. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

28. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 11/20/2023

ERIKA CSICSILA
Digitally signed by ERIKA CSICSILA
Date: 2023.09.21 13:29:39 -05'00'

Signed by Erika L. Csicsila on behalf of
MORRIS PASQUAL
Acting United States Attorney

JAIME SANDOVAL
Defendant

MARY MCCLELLAND
Digitally signed by MARY MCCLELLAND
Date: 2023.09.21 15:13:36 -05'00'

MARY KATHERINE MCCLELLAND
Assistant U.S. Attorney

DANIEL RADAKOVICH
Attorney for Defendant