UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 23 CR 197 |
| v. | Hon. Sharon Johnson Coleman |
| JAIME SANDOVAL | District Judge |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby submits its sentencing memorandum. For the reasons outlined below, the government respectfully requests that the Court impose a sentence at the high end of the applicable Guidelines range of 24 to 30 months' imprisonment and a three-year term of supervised release.

## I. BACKGROUND

On April 4, 2023, Jaime Sandoval ("defendant") was charged by indictment with unlawful transfer of a machinegun, in violation of Title 18, United States Code, Section 922(o). Dkt. 1. Defendant pled guilty pursuant to a plea agreement. Dkt. 22. Sentencing is scheduled for March 28, 2024. *Id.*

The details of defendant's offense conduct are contained in the plea agreement (Dkt. 23), the Presentence Investigation Report ("PSR") (Dkt. 24), and the Government's Version ("GVO"), which is attached to the PSR.

Between November 10, 2022, and January 24, 2023, defendant sold a total of five firearms and nine machinegun conversion devices to a confidential source ("CS-

1") and an undercover agent ("UC-1"). The indictment charges defendant with the unlawful transfer of three machinegun conversion devices to CS-1 and UC-1 on January 5, 2023. Between December 12, 2023, and January 5, 2023, defendant was communicating via text message with CS-1 who, unbeknownst to defendant, was working with law enforcement. When CS-1 asked about purchasing "switches" from defendant, defendant offered to sell switches to CS-1 for $125 each.

On January 5, 2023, defendant met with CS-1 and UC-1, who was working in an undercover capacity, in Chicago, Illinois. While defendant was in the undercover vehicle, he retrieved a firearm from his waistband, showed CS-1 and UC-1 the 3D-printed Glock conversion device installed on his firearm, and explained how to install the device onto a firearm. Defendant then handed three, 3D-printed Glock conversion devices to UC-1. In exchange, UC-1 handed defendant $350. UC-1 asked if the three, 3D-printed Glock conversion devices were the same as the one defendant had just shown CS-1 and UC-1 on his own firearm, and defendant responded, "Yea, it's the same ones."

Defendant knew at the time he transferred them on January 5, 2023, that the "switches" he sold to CS-1 and UC-1 convert semiautomatic firearms into fully automatic firearms. Defendant acknowledged in his plea agreement that these "switches" are Glock conversion devices, or machinegun conversion devices, as defined in Title 26, United States Code, Section 5845(b), in that they are parts designed solely and exclusively for use in converting a weapon into a machinegun

that shoots automatically more than one shot, without manual reloading, by a single function of the trigger.

In addition to the sale of the Glock conversion devices described above, over four other occasions between November 10, 2022, and January 24, 2023, defendant sold a total of five firearms and six other machinegun conversion devices to CS-1 and UC-1.

On November 8, 2022, defendant sent a video of three firearms, including an orange and black, AR-style pistol, to CS-1. Defendant and CS-1 then coordinated a meeting via text message for CS-1 to purchase a firearm from defendant. On November 10, 2022, CS-1 met defendant in Chicago, Illinois. When defendant drove up in a car, CS-1 sat in the front passenger seat. While CS-1 was in defendant's car, defendant gave CS-1 the firearm depicted in the video CS-1 received from defendant on November 8, 2022; that is, an orange and black, privately made, AR-style pistol loaded with sixteen rounds of .223 caliber ammunition. In exchange, CS-1 gave defendant $940.

Between approximately November 18, 2022, and November 25, 2022, defendant contacted CS-1 and exchanged text messages and a video with CS-1 about an additional firearm purchase. On November 28, 2022, CS-1 drove to meet defendant in Chicago, Illinois. Defendant explained that he needed to pick up the firearm from his "cousin," and asked CS-1 to follow him in his car to a nearby alley. Defendant's cousin arrived in a third car and entered a house bordering the alley. Meanwhile, CS-1 went to sit in defendant's car. A short time later, defendant's cousin exited the

house, approached defendant at his driver's window, and handed him a bag containing a privately made, AR-style pistol. Defendant handed the bag containing the firearm to CS-1, and CS-1 provided defendant with $900 in exchange.

Between approximately December 4, 2022, and December 6, 2022, defendant and CS-1 exchanged text messages to set up another firearm purchase. On December 6, 2022, defendant met with CS-1 and UC-1 in Indiana. Defendant provided CS-1 a black, privately made, 9mm, semiautomatic pistol incorporating a Glock-type slide, which contained a loaded magazine. Defendant gave CS-1 an additional unloaded pistol magazine. Defendant also gave UC-1 a white, privately made, .223 caliber, semiautomatic, AR-style pistol with a Hoffman Tactical 3D-printed lower receiver and a loaded rifle magazine.

In exchange for these firearms, UC-1 provided defendant $900, and CS-1 provided defendant $750, for a total of $1,650. UC-1 also gave defendant an extra $50 for traveling from Chicago, Illinois, to Indiana.

Between approximately January 14, 2023, and January 24, 2023, defendant communicated with UC-1 via text message and phone call to arrange another firearm purchase. On January 24, 2023, UC-1 met defendant in Chicago, Illinois. Defendant drove to the meeting location in a car, exited the car holding a gray towel, and sat in the front passenger seat of UC-1's undercover vehicle. In the undercover vehicle, defendant unwrapped the towel from a Zastava Model M70, 7.62-millimeter rifle, bearing serial number N-PAP047444, and gave the rifle to UC-1. Defendant then walked back to the car he arrived in, and returned to UC-1 with a clear plastic bag

containing six machinegun conversion devices and eight replacement auto sear blades. In exchange for these items, UC-1 paid defendant $2,000. Defendant acknowledged in his plea agreement that auto sear blades are parts attached to machinegun conversion devices that allow them to fire fully automatically.

## II. THE GUIDELINES CALCULATION IN THE PSR IS CORRECT

The government agrees with the total offense calculation outlined in the PSR. The base offense level is 18, pursuant to Guideline § 2K2.1(a)(5), because the offense involved a machinegun, as defined in 26 U.S.C § 5845(a). Additionally, there is a two-level enhancement pursuant to Guideline § 2K2.1(b)(1)(A), because the offense involved between three and seven firearms.[1]

Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct, and timely notified the government of his intention to enter a plea of guilty. Therefore, if the government does not receive additional evidence in conflict with defendant's apparent intention to accept responsibility, defendant will be entitled to a three-level reduction pursuant to Guideline § 3E1.1.

With respect to defendant's criminal history points, defendant has one criminal history point and defendant's criminal history category is I. Therefore, based on information now known to the government, defendant's total offense level is 17,

---

[1] The government incorrectly attributed an additional four-level increase to the total offense level in the GVO, based on the November 2023 Guidelines Manual now in effect.

which, when combined with a criminal history category of I, results in a Guidelines range of 24 to 30 months' imprisonment.

### III. THE 18 U.S.C. § 3553(A) FACTORS WARRANT A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE

The advisory Guidelines range is the starting point and initial benchmark for determining the appropriate sentence for defendant. *See United States v. Carter*, 961 F.3d 953, 955 (7th Cir. 2020) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). Although a sentence within the Guidelines range is presumptively reasonable, *see United States v. Harris*, 51 F.4th 705, 718 (7th Cir. 2022), the court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining an appropriate sentence. *See United States v. Smith*, 54 F.4th 1000, 1004 (7th Cir. 2022). Sentences within the advisory Guidelines range help avoid unwarranted sentencing disparities. *See United States v. Clay*, 50 F.4th 608, 612-613 (7th Cir. 2022). In this case, a sentence at or near the top of the advisory Guidelines range is sufficient, but not greater than necessary, to reflect the seriousness of defendant's offense, promote respect for the law, provide just punishment for defendant's crime, afford adequate deterrence, and protect the public from future crimes by the defendant.

#### A. Term of Imprisonment

The extremely serious nature and circumstances of defendant's crime warrant a prison sentence at the high end of the Guidelines range. Firearms are inherently dangerous, and machineguns are both dangerous and unusual. *United States v. Cooperman*, No. 22-CR-146, 2023 WL 4762710, at *3 (N.D. Ill. July 26, 2023). Defendant here sold not only firearms, but also machinegun conversion devices or

"switches" that would convert semiautomatic handguns into even more dangerous automatic weapons. Each of the switches defendant possessed and sold, when attached to a firearm, would enable a shooter to unload a high-capacity magazine in a matter of seconds, causing substantially more harm than a semiautomatic firearm. During the sale on January 5, 2023, defendant explained how to attach a switch to a semiautomatic handgun, using a handgun in his possession to explain and demonstrate to CS-1 and UC-1—showing his familiarity with these devices and his willingness to use them himself. A high Guidelines prison sentence is necessary to punish defendant for the seriousness of his offense.

A sentence at the top of the Guidelines range is also needed to deter defendant and others who would create and sell machinegun conversion devices, thereby protecting the public from ready-made, 3D-printed switches and firearms. Defendant engaged in selling these weapons over an extended time period, and was undeterred either by the fact that he was on felony probation (PSR ¶ 35) or that he was arrested for aggravated unlawful use of a weapon by local police officers during the time that he was selling to CS-1 and UC-1. *Id.* at ¶ 38. Defendant's short adulthood of escalating criminal activity is not meaningfully mitigated by the remainder of his history and characteristics. *See* PSR ¶¶ 5-12, 35-38. Defendant's conduct speaks to the need for specific deterrence, and the ongoing need to protect the public from future weapons offenses committed by defendant. Moreover, a prison sentence within Guidelines would also promote respect for the law and provide general deterrence. Despite a near-total ban on automatic weapons nationwide, switches 3D-printed in

plastic, like those that defendant was selling, can turn a semiautomatic firearm into a fully automatic weapon in seconds. Defendant's actions here show that these devices are cheap and easy to create or obtain. This reality demonstrates the strong need for general deterrence in this case. Substantial consequences are necessary to deter others from possessing or transferring switches, despite their increasing availability and popularity. The need for general deterrence in this case is high, and a sentence at or near the top of the applicable Guidelines range would appropriately account for this need.

### B.    Supervised Release

The government has no objections or additions to the conditions of supervised release in the PSR. The government agrees with Probation that the maximum supervised release term of three years should be imposed in this case. The nature of this offense and the history and characteristics of the defendant outlined above make a three-year term of supervision appropriate. *See* 18 U.S.C. § 3583(c).

**IV.    CONCLUSION**

For these reasons, the government respectfully requests that the Court impose a sentence at the high end of the applicable Guidelines range of 24 to 30 months' imprisonment, as well as a three-year term of supervised release.

Respectfully submitted,

MORRIS PASQUAL
ACTING UNITED STATES ATTORNEY

By:    /s/ Mary Katherine McClelland
Mary Katherine McClelland
Assistant United States Attorney
United States Attorney's Office
219 S. Dearborn St., 5th Floor
Chicago, Illinois 60604
(312) 353-0517

Dated: March 19, 2024

9